Good morning, Your Honor. I'm Deborah Garvin on behalf of Appellate and Defendant Officers Todd Burgess and Brian Stoney. Before I start, may I ask if the Court has any particular issues of concern you would like me to focus on? I do have a clarifying question. It's my understanding that Carmen told an employee of Customs that after he had been terminated that he continued to carry credentials in order to carry a concealed weapon. And that somehow from that employee the information came to Fuentes ultimately. Is that a correct chain? That's correct, Your Honor. And Officer Fuentes or Agent Fuentes is in the investigative unit. Of Customs? Of Customs. So that the employee would report to Customs and whether he reported to her directly or to someone in his chain of command, it would go to an investigative unit which Agent Fuentes was then assigned to investigate. And the record doesn't exactly show that, but that is the correct link, right? That is the correct link, yes, Your Honor. Okay. My ---- Let me stop you right there. Do you think, leaving aside what happened later, do you think Agent Fuentes had reasonable suspicion to stop the plaintiff any time he saw him? Agent Fuentes, I'm not sure Agent Fuentes knew the state of the law in California regarding carrying a sealed weapon on the public street. She was investigating the credentials allegations. Right. She was focusing on the credentials allegations, but when she relayed the information to the La Mesa Police Department, she gave information both with regards to the false credentials, identifying himself falsely as a Customs agent currently employed, and that he was illegally carrying a concealed weapon. And her knowledge of that was because he was using these falsified credentials to, in order to justify carrying the concealed weapon. And that information had been given to Agent Fuentes six months prior to that? Well, that's where it started. That's where her investigation started. She apparently still had reason to believe this was ongoing because she was continuing to investigate and was still investigating. Remember that the age of the information alone doesn't necessarily mean it's stale. But then when she reported it to the officer's detective, Bond, with her initial contact, he confirmed that Mr. Carman did not have a carrying concealed weapon permit. So he then agreed that the police would cooperate. Agent Fuentes wanted it done as a traffic stop to see if, in the circumstances, Mr. Carman would voluntarily produce the credentials. That was the purpose of it being done in a traffic stop. I understand that. I wanted to take it back a step and to see if I understood your position on whether Agent Fuentes had reasonable suspicion to stop Carman at any point, regardless. I mean, encounters Carman on the street and can stop him and with reasonable suspicion search right then. Do you think, as a matter of law, that Agent Fuentes had reasonable suspicion? I think Agent Fuentes had reasonable suspicion, and she had specific articulable facts, from a reliable informant, an employee with customs, who had no reason to lie about what Mr. Carman told him to customs. And because he was a reliable informant, I believe that she had reasonable suspicion if Mr. Carman was on the street to have him stopped and questioned about that. You know, I think you're underselling your position by calling this a reliable informant. We use that kind of vocabulary all the time. But this wasn't some scumbag guy off the street. This was an official source out of a government agency. I'm happy to – I mean, reliable informant carries with it all kinds of garbage. And this case doesn't. Yes, he was definitely – he was an employee of customs.  Now, this wasn't tipsters or drug dealers or bank robbers. The tip came from him, is my point in going through the beginning chain. I mean, he was the one who actually told customs that he continued to carry the credentials, right? That's correct. Mr. Carman told customs that, and customs was investigating it. Customs reported that through this chain that you're talking about. That's correct. And at that point in time, he gave it to the officers. Officer Stoney believed he had reasonable suspicion to stop Mr. Carman because of the carrying of a concealed weapon and just stopped him to see if he was carrying a concealed weapon based on the law in California on violations for carrying concealed weapons in a public place and the officer's right to search. He only did it as a traffic stop to accommodate customs. And then when Officer Burgess, who was the officer assigned to follow Mr. Carman, as he was following, he observed confidential license plates, confidential cover, which indicates that someone is likely in law enforcement. Based with all of this information that Detective Bonner allowed to go forward because the concealed weapons permit was invalid, Officer Burgess seeing the confidential cover because of the seriousness on weapons and the law in California on illegally carrying a weapon in the public street, the officers had reasonable suspicion to stop Mr. Carman and question him regarding his use of false credentials and his carrying of a concealed weapon, regardless of whether or not he violated a traffic stop. And if I understand the sequence correctly, it's also true that Burgess ran the check on the license plate before making the stop. That's correct. So that, in effect, has the effect of bringing current any possible sale information. Right? That's correct, Your Honor. He's still masquerading as law enforcement. That is correct. And one of the first questions Officer Burgess asked Mr. Carman whenever he asked him for his license was, I see you have confidential cover. What's that about? And Mr. Carman said, I'm on administrative leave of customs. See, we're telegraphing questions to your colleague at the table over there for him to think about before he stands up. Go ahead. And then once Mr. Carman said, I'm on administrative leave for customs, that followed a line of questioning to allow him to ask further about his status with customs, about the weapon. And when he was asked about the weapon, Mr. Carman admitted that he was indeed carrying a concealed weapon in his automobile and that it was a loaded weapon. Now, at that point in time, at some point in time, Detective Bond came up and continued the investigation, and Detective Stoney was investigating the various excuses Mr. Carman offered for carrying a concealed weapon. After Agent Fuentes arrived, she informed the officers that even if he were with customs, he was not allowed to carry a concealed weapon, even by customs. So when he was confronted with that, Mr. Carman kept saying, well, I'm a private investigator. I'm active on the case, or I am a guard. And none of these were valid. You have a minute to go. Would you like to save it for rebuttal? I would. Thank you. All right. We'll hear from the other side. Good morning, Your Honors. I'm Joel Golden. I represent John Carman. Looking at your questions and listening to your questions, I want to put the case in context for you. If you look at the briefs, you'll see that at one point in time, the defendants in this matter were numerous. Many of them were customs officers. Mr. Carman did work for customs. He reported corruption in customs. He was retaliated against. Those were his. Well, that's a different case and a different point. Those were the allegations in this complaint. And I'm putting it in context because. You know, your context is wasting time. I hope you don't take that as criticism, but you better get to the issue because you've got nine minutes left. The last act was the stop by the La Mesa Police Department acting under the authority or directions of customs. That's the context. I'm done with the context. Okay. You know, we read the briefs before the case starts. Sure. I wanted to point out page 11 of the brief. Officer Stoney told Officer Burgess, who made the stop, the following. I informed Officer Burgess that Mr. Carman was in his vehicle so that Officer Burgess could follow Carman until he had the probable cause to make a traffic stop. Look, the subjective beliefs of the officers are irrelevant. Exactly. It seems to me. Well, so that's irrelevant. The sequence of events shows, it seems to me, that Carman told customs that he continued to carry credentials in order to carry a concealed weapon. Fuentes passed that information on to law enforcement. Law enforcement then followed the guy, ran a check on his license plate, which confirmed that he was still representing himself as a law enforcement officer, despite the fact that he was terminated from customs. Stopped him, and it's irrelevant whether they stopped him correctly or incorrectly under California law for making a left-hand turn. You assume that that stop was ill – I mean, that his turn was legal. The question is, does that violate his constitutional rights? Put differently, was there – would a reasonable officer situated – well, forget that. Was there a violation of his constitutional rights? Associate. I don't think there was. All right. Well – And so why do you think there was? Mr. Carman denied making that statement to a customs officer. Did he deny him using the plate that he was caught with? No. He denied that – You know, this is reasonably serious stuff. There's a long history in California of people masquerading as law enforcement officers, kidnapping, murdering people. I mean, this is not some technical thing about somebody violating credentials. Go back and read the Hillside Strangler case. There's lots of these things. People on the loose with credentials and firearms have proved to be very dangerous. So it doesn't surprise me they went out to try to stop this. Well, I understand that. And so then they find this phony license plate and they stop the guy. Well, and that itself is a federal crime. And, you know, Mr. Carman was never charged with anything like that. So, you know, I understand that. But qualified immunity would seem absolutely to cover a situation like this. Well, I understand what you're saying. But I believe that the entire case basically shows that they were – customs was retaliating against him. And I don't think they did establish the probable cause. Retaliating against him for using false credentials and carrying a concealed weapon when he didn't have any right to use one? That information was denied to having been made by Mr. Carman. And even that information was seven months old. So it's stale in that sense. Isn't it updated when they see the plate? Well, not necessarily. But it's so bad that it renders these people civilly liable? I mean, qualified immunity protects mistakes. But they have to really be, you know – I mean, it even protects unreasonable conduct. But it has to be so clearly off. But when does the objective standard, when an officer is told by his supervisor and when the liaison person for the La Mesa Police Department, who got all the information from customs, says to the traffic-stopping officer, don't stop until you have probable cause to make a traffic stop? This is just a bunch of police officers trying to maneuver through the thicket of rules. But if I'm a subordinate of a sergeant who's telling me I need to find independent probable cause, then I believe, as an objective standard, I have to assume there isn't probable cause until I've seen the traffic violation. That's – That's more subjective. And obviously it strengthens your case in a psychological sense. But on an objective basis – Well, I'm just – Well, no. It adds something. But I think if you look – if you look wholly objectively, that's what we have to focus on. The question is, independent of the traffic stuff, independent of whether they thought they had to get probable cause, were there – did they have reasonable suspicion to stop him based on the conversation with Fuentes? It's all based on that statement that Your Honor asked in the beginning of our presentation concerning whether Carmen had told another customs agent that he had carried a gun and was still – Right. But I think for these defendants, we have to measure what they knew, and then by an objective standard, would disqualified immunity protect that? I mean, we can't – we can't tar them with everything that customs did. So – I just – So I'm saying that. I'm not quarreling. I'm just saying for my benefit, would you focus on that question on the objective? Now, see, the thing is, it comes to the officers who executed the stop. They know that customs believes that this individual is using customs credentials fraudulently and is carrying a concealed weapon without authority. That's what they believe. That's what they've been told. Why doesn't – why don't those two things give those officers reasonable suspicion to stop the car? Well, because I believe it is – I believe that the stop made by Officer Burgess, if that was all that was said, perhaps he might be able to. But when he is instructed that he needs to find – But that doesn't – it just doesn't matter what he was instructed or what's in his head. Why, objectively, does that not give them reasonable cause when the third thing, I forgot to add in, is that they have just confirmed that he has law enforcement plates and they know he's not a law enforcement officer? Well, what you're saying is that whatever customs would tell the La Mesa police, they should rely on them. Sure, because the La Mesa police don't know anything about all the stuff that you're telling us about now. They're just a bunch of police officers being told by a federal agency, this guy's masquerading as a law enforcement officer carrying a gun and he has no business doing it. Put yourself in that position. You're a local law enforcement officer. Is it not reasonable for you to respond to that information coming from a federal law enforcement agency,  Well, I'm not under the circumstance. Oh, you wouldn't? Okay. I expect that would be your answer. I understand. Well, I think, though, before you sit down, do you concede?    Okay. I expect that would be your answer. I understand. Well, it's not hypothetical. The three things that exist in this case, are you conceding that would be reasonable suspicion to stop them independent of the traffic violation? I think he had to see a traffic violation to stop them. Okay. Why don't you think there was reasonable suspicion absent the traffic violation? Reasonable suspicion from just what was told to him. Right. And his checking of the license plate. Right. Well, I think that the, I'm not sure. I think the cover on the license plate can have other aspects to it other than being a law enforcement officer. He was a private investigator. Private investigators can't use those kinds of plates. For example, if your case were we got an anonymous tip that this guy was carrying a concealed weapon, et cetera, et cetera, it might be a slightly different case. We've had cases that say, well, anonymous tips aren't enough. Here you have customs communicating. It may or may not be different, but I'm just trying to see if you have an argument on that issue. My time is up. Okay. Would you like me to continue? No, that's all right. Thank you.
judges: Trott, Rymer, Thomas